**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Joseph J. BERTUCCI, a/k/a Frank James Bertucci, et al., Defendants-Appellants.**

**Nos. 75-1795 to 75-1797.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 1976.

Decided April 2, 1976.

Rehearing Denied June 4, 1976.

Charles A. Bellows, William J. Harte, Chicago, Ill., for defendants-appellants.

Henry A. Schwarz, U. S. Atty., Robert Simpkins, Asst. U. S. Atty., E. St. Louis, Ill., for plaintiff-appellee.

Before SWYGERT and BAUER, Circuit Judges, and HOFFMAN, Senior District Judge.*

JULIUS J. HOFFMAN, Senior District Judge, Sitting by Designation.

These appeals by the defendants Joseph J. Bertucci, a/k/a Frank James Bertucci, Joseph A. Argento and Phillip F. Abbott, from their convictions for possession of stolen goods in violation of 18 U.S.C. § 659 present the question of whether a warrantless search of a motor vehicle was reasonable under the Fourth Amendment. The district court denied the joint motion of the defendants to suppress evidence thus obtained and entered judgments of conviction upon jury verdicts of guilty. We affirm the judgments of the trial court.

At 1:30 a. m, on November 17, 1974, Illinois State Troopers Clyde Paris and Donald Pabst observed a north-bound Chevrolet

* The Honorable Julius J. Hoffman, Senior District Judge for the Northern District of Illinois, is sitting by designation.

van weaving back and forth across the center line of Illinois State Route # 1, eight miles south of Mt. Carmel, Illinois. By means of a flashing red light, the officers directed defendant Bertucci, who was driving the van, to pull over into a gravel lot adjacent to the highway. Bertucci pulled over as directed and the officers parked behind the van. Bertucci then emerged from the van and met the officers between it and the patrol car. Upon request, Bertucci displayed a valid Illinois driver's license and when questioned about the weaving, replied that he was tired. Pabst and Paris detected no odor of alcohol.

They proceeded with Bertucci to the front of the van for the purpose of conducting a customary inspection for alcohol or weapons. At the open door on the driver's side, Bertucci stepped quickly in front of Pabst as if to restrain him from looking into the van. Proceeding to shine their flashlights through the front windows, the officers observed defendant Abbott in the passenger seat and also some shipping cartons in the rear of the van, with defendant Argento lying "spread eagle" over the tops of some of the cartons. Bertucci volunteered that the three men were moving his aunt from Evansville, Indiana, to Chicago, Illinois, and produced his copy of an agreement for the rental of the van. In their inspection, the officers discovered no alcohol or weapons.

Accompanied by all of the defendants, the officers moved to the rear exterior of the van. By flashlight through the window, they observed that the shipping cartons were sealed and that invoice envelopes were attached to them. Bertucci then stated that his aunt had bought the goods in Evansville and that he, Abbott and Argento were moving them to Chicago for her. The officers requested Bertucci's permission to examine the cartons more closely. In response, he opened the rear door of the van. The officers then removed an invoice bearing the address of a hardware store in Beaver Dam, Kentucky, from an envelope attached to one of the cartons. Bertucci said that if permitted to make a phone call, he could verify his story of why the three men were transporting the cartons.

The officers then directed the defendants to the Mt. Carmel, Illinois, police station, where they were advised of their rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At the station, the officers opened the shipping cartons and discovered the contents to be trousers and stereo components. By telephone conversation with the shopkeeper at the address in Beaver Dam, Kentucky, Pabst and Paris learned that goods ordered several weeks previously had not arrived. In a third version of why the defendants were in possession of the cartons, Bertucci stated that he had purchased them from an Eddie Andrews at 201 First Street in Evansville, Indiana. The Evansville police found no listing for Andrews or the address. While defendants were permitted an unlimited number of telephone calls from the police station, none produced information substantiating any of Bertucci's explanations.

The Fourth Amendment prohibits unreasonable searches and seizures. "Except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court,* 387 U.S. 523, 528–529, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930, 935 (1967). The parties do not here question the reasonable police conduct of stopping a weaving van at 1:30 a. m., and inspecting the front thereof for intoxicants and weapons. *United States v. Hood,* 493 F.2d 677, 680 (9th Cir. 1974), *cert. denied* 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974). What they vigorously dispute is the authority of the officers under the Fourth Amendment to inspect the rear portion of the van.

■ We conclude that the officers had probable cause to search the entire van for alcohol or weapons. Thus, any Fourth Amendment distinction between the front and rear portions is untenable. If the officers may lawfully search the front for alcohol or weapons, it would be unreasonable to expect them not to search the rear. Both

the front and rear are logical places for concealment of alcohol or weapons. In view of the weaving and the furtive attempt of Bertucci to restrain Pabst from looking into the van, the officers could justifiably expect to find alcohol or weapons, even though Bertucci had said that he was merely tired and the officers had detected no odor of alcohol. None of the defendants has suggested that a warrant is required to inspect the back seat of an automobile, which has been stopped for weaving, for weapons or alcohol. Open to view by flashlight from three windows, the rear portion of the van is like the back seat of an automobile. It is unlike the trunk, which because of its complete enclosure, might generate a greater expectation of privacy then the back seat, and even a trunk is accessible to warrantless search under appropriate circumstances. *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Furthermore, the fact of nightfall makes no difference in the case before us. Darkness does not usher in a set of Fourth Amendment rules different from those applicable in daylight.

The limited intrusions of Pabst and Paris are acceptable for other reasons. It is familiar doctrine that objects in plain view of officers rightfully in position to have that view are subject to seizure without warrant. *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1967). The stop by the officers of the weaving van rightfully brought them into position to observe the cartons by flashlight through the front or rear windows. The shipping cartons plainly visible in the rear might have contained either weapons or intoxicants. It is no answer that they contained evidence of a crime instead, for the Supreme Court has recognized that " . . . often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits or instrumentalities of a crime, or contraband." *Cady v. Dombrowski, supra,* 413 U.S. at 442, 93 S.Ct. at 2528, 37 L.Ed.2d at 715.

When at the rear of the van, Bertucci modified his original explanation of the presence of the cartons, it would have been reasonable for the officers to conduct a more extensive search than the inspection actually undertaken. Bertucci realized that the sealed shipping cartons with invoice envelopes attached appeared new to the officers, and hence he explained that his aunt had bought the goods in Evansville. The evasiveness of a defendant was among the factors establishing reasonable grounds for an automobile search in *United States v. White,* 488 F.2d 563 (6th Cir. 1973), and courts have long recognized the utility of a motor vehicle for transporting evidence beyond official grasp, adjusting standards for warrantless automobile searches accordingly. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1924); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *United States v. Zemke,* 457 F.2d 110 (7th Cir. 1972).

■ Even if we assume that the modified story and the mobility of the van do not together establish the reasonableness of the limited intrusions that occurred, the trial court might properly have found that Bertucci consented to the inspection of the cartons in the rear. Whether consent to a search is voluntary is to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Watson v. United States,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598, 44 LW 4112 (1976). Although Bertucci testified that he never gave permission to search the van, he nevertheless opened the rear door in response to the officer's request to examine the cartons more closely. The record discloses no overt act, threat of force, promise or other form of coercion suggesting that the opening of the door on a public highway prior to any arrest was other than voluntary. *Watson v. United States,* 423 U.S. at 424, 96 S.Ct. at 828–29, 46 L.Ed.2d at 609, 44 L.W. at 4116. Justifiably, the officers inspected the cartons and removed an invoice from an envelope attached to one of the cartons.

We recently said that "the ultimate test of the legality of the search and seizure is

the reasonableness of the police officer's conduct." *United States v. Balanow*, 528 F.2d 923 at 924 (7th Cir. 1976). The record before us discloses limited intrusions acceptable on grounds of inspection for weapons and intoxicants as well under the "plain view," "consent," and "automobile" exceptions to the warrant rule. These limited intrusions in turn produced sufficient information to establish reasonable grounds for a full search of the shipping cartons in the rear of the van. We cannot conclude that this police conduct is unreasonable under the Fourth Amendment.

■ Defendants Argento and Abbott also contend that there is insufficient evidence to establish their guilt beyond a reasonable doubt. If there is substantial evidence, taking the view most favorable to the Government, to support the verdict of the jury, the verdict must stand. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942); *United States v. Keefer*, 464 F.2d 1385, 1388 (7th Cir. 1972).

All of the defendants occupied a van ultimately found to contain stolen goods. The officers initially observed Argento lying on top of the cartons that contained these goods. Mud and cockleburrs were visible at the time of arrest on the clothing of the defendants and muddy clothing lay in the rear of the van. There was testimony that the cartons of trousers had been removed on the day of the arrest from a trailer standing on a lot in Evansville, Indiana, that was wet, muddy, and overgrown with weeds bearing burrs. There was evidence that the stereo equipment had been removed from a shipping dock in Evansville within a period of two days prior to the arrest. Argento and Abbott nodded their assent to Bertucci's explanations for the presence of the cartons in the van. Because we therefore conclude that substantial evidence supports the verdicts of the jury and that, for the reasons set forth, the motion to suppress was properly denied, the judgments of conviction will be, and are *affirmed*.

AFFIRMED.

SWYGERT, Circuit Judge (dissenting).

A few additional details are needed to round out the factual situation as presented by Judge Hoffman. The road on which the van was traveling was a two-lane highway and the traffic was light. After the vehicle had been stopped and the initial conversation had occurred between Bertucci and trooper Pabst, officer Paris testified that "We started to the front of the van and Mr. Bertucci stepped in front of Pabst and indicated he didn't want him to look in the van for some reason or another." The testimony continued:

"Q. There was no other conversation from Mr. Bertucci with either of you officers up to this point, is that correct?

A. Well, about that point he started telling why he was down here in a van. Other than that, none.

Q. Was that in response to any question of yours to him?

A. Well, we automatically looked in the car for booze, weapons, other people in the car and we seen the new boxes or what appeared to be factory-crated boxes.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. You found nothing?

A. Neither beer nor weapons.

Q. Did you search the glove compartment at this time?

A. No, we did not.

Q. Was there any reason for you to believe at that point that a crime had been committed?

A. No, there wasn't. &ast; &ast; &ast;

Q. Were any traffic charges placed against Mr. Bertucci or the other individuals in his van?

A. No, there was not.

Q. Did you have a warrant to search the vehicle?

A. No, sir.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. After searching the front of the vehicle, what did you do then?

A. We asked Mr. Bertucci if he would open the rear of the van, that we would like to look in there which he did.

Q. What did you then do?

A. We looked a little closer at the boxes, at the invoices.

Q. Did you actually get into the van itself?

A. I don't know sir. We didn't crawl in. We just looked at the back boxes and at this time Mr. Bertucci changed his story from moving the van to Chicago to picking up some articles which—

Q. At that time you had no reason to believe that any offense had been committed, had you?

A. No, sir.

Q. Was there anything unusual about these boxes in the back of the van?

A. Just his story was the only thing."

Admittedly, under certain circumstances police officers may conduct a warrantless search of a vehicle which has been moving on a highway. In *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.543 (1925), the Supreme Court recognized such a search is constitutionally valid if probable cause exists. The difficult question then is: was there probable cause for a search without a warrant? In *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948), Mr. Justice Rutledge writing for the Court defined the phrase in general terms: "In dealing with probable cause, however, as the very name implies, we deal with probabilities . . . 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' . . . Since Marshall's time at any rate, it has come to mean more than bare suspicion." 338 U.S. at 175, 69 S.Ct. at 1310, 93 L.Ed. at 1890. Mr. Justice Rutledge continued: "The troublesome line . . . is one between mere suspicion and probable cause. . . . [A] citizen who has given no good cause for believing he is engaged in . . [criminal activity] is entitled to proceed on his way without interference." The decision emphasized that travelers on public highways may not be stopped and searched at the "officers' whim, caprice or mere sus-

picion." 338 U.S. at 177, 69 S.Ct. at 1311, 93 L.Ed.at 1891.

Here the question is whether the state troopers had probable cause to make the initial search of the van on the highway which resulted in a full search of the cartons at the police station or did they act on mere suspicion. The officers issued no citations for traffic violations, there were no arrests, and no weapons were found after the van was stopped on the highway. Consequently there was no reason for the state police to detain Bertucci and his passengers. It is apparent from the evidence that the police officers' observation of the cartons in the rear of the van and Bertucci's explanation for their being in the van aroused the suspicion of the police. But it was *only* suspicion. Under no circumstances could these observations represent sufficient probable cause for a warrantless search.

The majority attempts to invoke the plain view doctrine to justify the search. In *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the Supreme Court dealt extensively with the doctrine. There, the Court assumed that the police had probable cause to seize the automobile in question, but held that the plain view exception to the warrant requirement was inapplicable. Mr. Justice Stewart wrote: "Where the initial intrusion that brings the police within plain view of such an [article of incriminating character] is supported, not by warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. . . . And an object which comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant. . . . Finally, the 'plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object." 403 U.S. at 465–66, 91 S.Ct. at 2037, 29 L.Ed.2d at 582. The doctrine, however, has severe limitations. Mr. Justice Stewart explained:

What the "plain view" cases have in common is that the police officer in each

of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. *Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.* 403 U.S. at 466, 91 S.Ct. at 2038, 29 L.Ed.2d at 583. (emphasis added.)

In the case before us, it could hardly have been "immediately apparent" to the police that the cartons they saw in the rear of the van were "evidence." In fact, the testimony of officer Paris quite clearly indicates the officers had no reason to believe an offense had been committed, thus no reason to believe an event had occurred for which evidence might be seized. The fact that subsequent investigation showed the cartons contained stolen goods is irrelevant. "Nor is it material that the search was successful in revealing evidence of a violation of a federal statute. . . . A search prosecuted in violation of the Constitution is not made lawful by what it brings to light." *Byars v. United States,* 273 U.S 28, 29, 47 S.Ct. 248, 71 L.Ed. 520, 522 (1927).

*Coolidge* also emphasized the need for prior justification for the initial intrusion which led to the seizure of an object in plain view. Here, there was no search incident to an arrest or any other recognized exception to the warrant requirement. What the police saw when they directed their flashlights toward the back of the van were some cartons. After the rear door of the van was opened they conducted a closer inspection and found that the cartons were labeled with shipping invoices.

Thus, though the cartons were in "plain view," they were neither instruments of crime nor, at the moment, evidence of a crime. The Supreme Court stressed in *Coolidge* that the plain view doctrine "*alone* is never enough to justify the warrantless seizure of evidence," the discovery "must be inadvertent," and occur after an "initially valid (and therefore limited) search." The police may not justify a planned warrantless seizure by maneuvering themselves within the plain view of the object they want. 403 U.S. at 468–70, 91 S.Ct. at 2039–40, 29 L.Ed.2d at 584–85. The circumstances in this case cannot render the "plain view" doctrine applicable.

The majority also constructs a theory based on "consent" to justify the search. (The district judge did not base his denial of the motion to suppress on any such theory.) But this, upon analysis, also fails.

A search conducted pursuant to a valid consent is constitutionally permissible; however, the consent must be freely and voluntarily given. *Schneckloth v. Busta-monte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In this case there is no evidence of a valid consent. If anything, the evidence indicates an initial refusal by Bertucci to permit a search of the van. The troopers, however, proceeded to search the front of the van. When asked what they did next, officer Paris testified: "We asked Mr. Bertucci if he would open the rear of the van, that we would like to look in there which he did." The consent theory hangs on this thin isolated statement. Given the circumstances preceding the request and the situation in general, this is too weak to support it. "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 802 (1968).

Officer Paris testified at the hearing on the motion to suppress that Bertucci said

that if defendants could get to a telephone they could satisfy the officer that the cartons "were being picked up for an aunt." The officer further testified that he and officer Pabst followed the defendants to the Mount Carmel police station. At the trial, officer Paris testified: "We directed them to drive to the Mount Carmel Police Department where calls could be made and confirm that this stuff did not belong to their aunt." At the police station the defendants were advised of their *Miranda* rights. The officers apparently then opened the cartons and found that some of them contained blue jeans and others contained stereo equipment. Upon telephonic investigation it was ascertained that all the items were stolen. The majority opinion states:

> The record before us discloses limited intrusions acceptable on grounds of inspection for weapons and intoxicants as well under the "plain view," "consent," and "automobile," exceptions to the warrant rule. These limited intrusions in turn produced sufficient information to establish reasonable grounds for a full search of the shipping cartons in the rear of the van.

Since none of these exceptions to the warrant rule were applicable, in my view the police were not authorized to "direct" the defendants to the police station, to question them, or to open the cartons without a search warrant. The "fruits" of this illegal detention, questioning, and search were tainted by the illegal actions of the police at the highway scene and therefore should have been suppressed.

In sum, I think we must keep in mind what Mr. Justice Jackson wrote in his dissent in *Brinegar:*

> [T]he right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court.
>
> Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and

the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear.

> Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty.
>
> * . * * * * *
>
> We must therefore look upon the exclusion of evidence in federal prosecutions, if obtained in violation of the Amendment, as a means of extending protection against the central government's agencies. So a search against [the defendants'] car must be regarded as a search of the car of Everyman.

I would reverse.